IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Laurence Anderson, | ) | Civil Action No. 3:06-3409-CMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Lowe's Home Centers, Inc. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Laurence Anderson ("Anderson"), filed this case on December 4, 2006. He alleges

claims for reverse racial discrimination under Title VII & § 1981,[1] retaliation, and violation of the

Family Medical Leave Act ("FMLA") against his former employer, Lowe's Home Centers, Inc.

("Lowe's").[2] Lowe's filed a motion for summary judgment on December 17, 2007. Anderson filed

a response on January 22, 2008. Lowe's filed a reply on February 1, 2008.

## Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy

v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the

evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take

special care when considering summary judgment in employment discrimination cases because

states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension

---

[1]Claims under Title VII and § 1981 are subject to the same analysis. Gairola v. Va. Dep't
of Gen. Svcs., 753 F.2d 1281, 1285 (4th Cir. 1985).

[2]Pretrial matters were automatically referred to the undersigned pursuant to Local Rule 73.02
(B)(2)(g), DSC.

Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir.

1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

## Facts

**A.**    **Anderson I**

1.    Anderson is a white male.

2.    In Anderson v. Lowe's Home Centers, Inc., C.A. No. 3:04-1740-22BC ("Anderson I"), Anderson alleged, *inter alia*, that Lowe's discriminated against him because of his race when it hired Willie Fuller ("Fuller"), an African-American, for the position of Area Human Resources Manager ("AHRM"), instead of promoting him.

3.    Ric Crews ("Crews"), an African-American, was Lowe's Regional Human Resources Director and was responsible for hiring Fuller instead of promoting Anderson.

4.    This Court granted Lowe's motion for summary judgment in Anderson I except as to Anderson's failure to promote claim.

5.    The parties settled Anderson I prior to trial.

6.    Anderson remained as Human Resources Manager ("HRM") at Lowe's Store No. 499 ("No. 499") in West Columbia.

7.    Fuller and Crews remained in their respective positions, directly over Anderson in Lowe's human resources hierarchy.

**B.**    **Ida Hutto**

1.  In approximately June of 2004 (the same month Anderson I was filed), an hourly employee, Ida Hutto ("Hutto"), had a physical altercation with another hourly employee. (Pl. Mem., Ex. 3, pp. 51-53).

2.  Such an incident is considered work place violence and is to be investigated by a threat assessment team. (Def. Mem., Ex. C, pp. 77-78; Ex. F, pp. 161-62).

3.  Anderson, the Store Manager of No. 499, Craig Mason ("Mason"), and Richard Epps ("Epps"), Lowe's District Manager, investigated the incident. (Pl. Mem., Ex. 3, p. 52).

4.  According to Crews, Lowe's policy requires involvement of the HR hierarchy prior to termination of an employee in a workplace violence situation. Procedure dictates that both employees should have been suspended immediately and terminations determined after investigation. (Pl. Mem., Ex. 16, pp. 166-74).

5.  On the night of the incident, Anderson attempted to contact Fuller, but he did not respond. Anderson, Epps, and Mason "collectively agreed" that Hutto be terminated. (Pl. Mem., Ex. 3, pp. 52-53).

6.  Crews and Epps agreed that the proper policy had not been followed and that Epps should give Anderson a reprimand concerning the incident.[3] (Pl. Mem., Ex. 16, p. 164).

---

[3]Crews testified that Epps was verbally reprimanded for the Hutto decision by his supervisor, Mike King("King"), Lowe's Regional Vice President. However, King did not recall the reprimand. (Pl. Mem., Ex. 7, p. 16; Ex. 16, p. 169).

7.      Crews was deposed in Anderson I on January 19, 2005. The following exchange occurred:

> Q.      Okay. And it's been five months and Mr. Anderson will now be written up for this [Ida Hutto incident]?

> A.      The District Manager [Epps] failed to follow through with that direction and so we're not going to follow through with that. He's not going to be written up. (Pl. Mem., Ex. 16, p. 171).

8.      Anderson has never been reprimanded for the Ida Hutto incident. (Pl. Mem., Ex. 3, p. 55).

## C.    Joyce Goodwin

1.      On December 27, 2004, a Lowe's employee, Earlene Dawkins ("Dawkins"), notified Fuller that a former employee, Joyce Goodwin ("Goodwin") continued to use her employee discount card after she had been terminated. (Def. Mem., Ex. S, Tab 1).[4]

2.      Fuller investigated the matter and found that Goodwin had last worked on October 31, 2004, but remained an active employee until December 13, 2004 (the day Dawkins contacted Mason). (Id.).

3.      Fuller documented that during that period, Goodwin improperly used her employee discount card. (Id.).

4.      Several employees reported to Fuller that Goodwin had told them that Anderson allowed her to keep using the card. (Id.).

---

[4]Dawkins contacted Fuller because she had notified Mason of the situation on December 13, 2004, but had heard nothing back from him.

5.     Fuller contacted Goodwin by telephone. Goodwin testified that Fuller stated that "he needed a reason to get rid of Lawrence." Goodwin told Fuller that Anderson was "a good friend" and that she "had nothing to say." The conversation ended. (Def. Mem., Ex. L, pp. 12-13).[5]

6.     Fuller's investigative report went to Crews. Fuller recommended that the matter "be referred to the District Manager [i.e., Epps] for action/disposition" (Def. Mem., Ex. S).

7.     Epps and Mason discussed the issue and decided, based on Fuller's report, that Anderson should be "documented" for failing to timely process Goodwin's separation paperwork. (Pl. Mem., Ex. 2, p. 52; Def. Mem., Ex. F, pp. 36-37).

8.     A written reprimand was prepared and sent to "corporate legal" for review. They advised that the reprimand not be issued, and it never was. (Pl. Mem., Ex. 2, pp. 51-52 and 59).

9.     In March of 2005 (Complaint, ¶ 9), Anderson discovered the proposed reprimand on Mason's desk and surreptitiously made a copy of it. (Pl. Mem., Ex. 3, pp. 45-48).

**D.     Illness - March 2005**

---

[5]Goodwin also testified that Mason was the person who told her that she could continue to use the employee discount card. However, her testimony cannot be read to support a conclusion that she told this to Fuller. (Id.).

6

1.      In the latter part of March of 2005, Anderson had several medical problems and was out of work. (Pl. Dep., Ex. 6, 8-10).[6]

2.      On March 28, 2005, Anderson saw his doctor for abdominal pain.    The office note from that visit indicates "must rule out diverticulitis." (Def. Mem., Ex. B, p. 63 and Pl. Dep., Ex. 8).

3.      Anderson presented Mason with doctor's notes covering his absence from March 25 through March 31, 2005.[7] (Id., p. 61).

**E.      Realignment of HRMs**

1.      Epps became Manager of the District which included No. 499 in February of 2005. (Def. Mem., Ex. F, p. 54).

2.      He became aware that Paul Gorman ("Gorman"), a white male and the HRM at Lowe's Store No. 385 ("No. 385"), located on Harbison Boulevard, intended to retire in April of 2005.  No. 385 was also in Epps' district. (Id. at 53).

---

[6]A portion of Anderson's deposition in this case is attached to Lowe's memorandum in support of its motion for summary judgment as Exhibit B.  Several exhibits to the deposition, including Anderson's medical and leave request documentation, are included.  These deposition exhibits will be referred to as "Pl. Dep., Ex. ___" in this Report and Recommendation.

[7]It is unclear which days in March Anderson was out sick.  When asked how long he had been out of work prior to April 1, 2005, Anderson testified, "I believe about two weeks." (Pl. Mem., Ex. 3, pp. 59-60).  His records show that for the pay period from March 26 through April 8, 2005, Anderson worked 16 hours and was out sick 64 hours. (Pl. Mem., Ex. 21).

3.    Instead of posting to fill the vacancy to be created by Gorman's retirement, Epps decided to "laterally move people" within his district and promote an HRM-in-training. (<u>Id</u>. at 54).[8]

4.    On March 31, 2005, Epps emailed Crews and Fuller to advise them of his intentions to shuffle HRMs that they supervised and to seek their counsel. Epps stated that he saw Gorman's retirement as an "opportunity to relocate some of our HR Managers to better utilize the strengths and development opportunities of both the HR Managers themselves and the stores."  The moves were:

a.    Transferring Anderson from No. 499 to No. 385 to replace Gorman;

b.    Transferring Audrey Williamson ("Williamson"), an African-American female and the HRM at Lowe's Store 1064 ("No. 1064"), Garners Ferry Road, to No. 499 to replace Anderson;

c.    Transferring Regina Barton ("Barton"), a Native American female and the HRM at Lowe's Store No. 2520 in Newberry ("No. 2520") to No. 1064 to replace Williamson; and

d.    Promoting Heidi Ellis-White ("White") from HRM-in-training to HRM at No. 2520 to replace Barton. (Pl. Mem., Ex. 10).

---

[8]Lowe's policy states "Operations, Sales, Zone, Administrative Department, and H.R. Managers and Specialists may be laterally transferred from one store to another within the same district and job category in order to fill an open position." (Pl. Mem., Ex. 3, p. 93).

5.   Epps stated to Crews and Fuller that he intended to advise each effected employee of the moves on April 1 and that the moves would be effective as of April 16, 2005. (Id).

6.   Crews and Fuller concurred in the moves.  Crews prepared a memorandum from the HR perspective detailing the positive points of each transfer.  He described Anderson's transfer from No. 499 to No. 385 as a "(g)reat move" and gave specific reasons.  Crews sent Fuller a copy of his memorandum on April 3, 2005, to use as the moves were implemented. (Id.).

**F.    Epps Informs Anderson - April 1, 2005**

1.   Epps met with Anderson and Mason on April 1, 2005, at No. 499 and informed them that Anderson was being transferred to No. 385 to replace Gorman effective April 9, 2005.  Anderson objected to the move based on his health concerns and that it would limit his bonus for 2005.[9] (Pl. Mem., Ex. 3, pp. 78-80; Pl. Mem., Ex. 4).

2.   Epps responded to Anderson's concerns, but it was not to his satisfaction. (Id.).

3.   After meeting with Epps, Anderson left work sick. (Pl. Mem., Ex. 3, p. 82).

**G.    Illness - April 2005**

1.   Anderson visited or called his doctor on April 5, 2005 and was given a note to be absent from work from that date through April 17, 2005.  (Pl. Dep., Ex. 7).

---

[9]Lowe's provides employees with opportunities to receive multiple bonuses during the year. See discussion below.

2.     In April of 2005, Anderson was diagnosed with "diverticulitis complicated by significant stress that he was undergoing as a result of perceived discrimination and retaliation during his employment with Lowe's." (Pl. Mem., Ex. 1, p. 1).

**H.     Legal Consultation**

1.     Anderson advised his attorneys that he was being transferred, and they contacted Lowe's counsel in an effort to have the "retaliatory transfer" rescinded. (Pl. Mem., Ex. 5).

2.     Lowe's counsel did not respond, and on April 11, 2005, Anderson's counsel emailed Lowe's counsel that a new charge of discrimination was being filed with the EEOC. (Id.).

3.     Anderson signed the EEOC charge on April 12, 2005, alleging racial discrimination and retaliation (Pl. Dep., Ex. 18; Def. Mem., Ex. B).

**I.     Gary Anderson, Sr.**

1.     Gary Anderson, Sr. is the father of Anderson. (Pl. Mem., Ex. 3, p. 6).

2.     On or about April 6, 2005, Mason and Ron Wotring ("Wotring"), store manager for No. 385, received telephone calls from a person purporting to be Gary Anderson, Sr. who made threats against Fuller.  Counsel for Lowe's telephoned Anderson's counsel and followed with a letter giving Anderson notice of the threats and advising Anderson "to take any actions necessary to insure that continued threats are not made."  Anderson also was advised that continued threats "could lead to disciplinary action against" him. (Pl. Mem., Ex. 6; Ex. 12, p. 53; and Ex. 15).

**J.**     **Anderson at No. 385 - April 18, 2005**

1.     Anderson reported for work at No. 385 on April 18, 2005. (Pl. Mem., Ex. 3, p. 75).

2.     Wotring, the Store Manager of No. 385, told Anderson that he was expected to work daily from 6:30 a.m. to 5:00 p.m. or 7:00 a.m. to 6:00 p.m. (Pl. Mem., Ex. 15, ¶ 3).[10]

3.     Upon Anderson's arrival, Gorman was still in the HR department at No. 385,[11] (Pl. Mem., Ex. 11, ¶ 3, and Kim Thompson was the HRM-in-training (Pl. Mem., Ex. 12, p. 45).

4.     On April 18, 2005, two separate things that affected the work of the HRM were in progress at No. 385:

a.     "100 days of Hell."   This appears to be a seasonal phenomenon common to all Lowe's stores when they "ramp up" for the Spring home improvement and gardening season. (Pl. Mem., Ex. 11, ¶ 5).

b.     Remerchandising.   According to Wotring, a remerchandising involves "(t)aking a store apart and putting it back together, and staying open and keeping as much business as you possibly can during that time frame and making money for the company." (Pl.

_____

[10]Wotring has no recollection of discussing work hours with Anderson.  According to Wotring, "I always tell all of my employees that, especially my salaried employees, they need to do whatever they have to do to get the job done." (Pl. Mem, Ex. 12, p. 56).  According to Mason, Anderson worked from "between seven and eight in the morning till five in the afternoon" at No. 499 (Pl. Mem., Ex. 2, p. 46).

[11]Gorman actually remained at No. 385 until he finally retired in February 2006. (Pl. Mem., Ex. 11, ¶ 3).

Mem., Ex. 12, p. 8).   A remerchandising requires "completely changing the layout of the store." (Id. at 11).  Because No. 385 was an older store, its remerchandising began with construction requiring a portion of the parking lot to be roped off. (Id. at 8-15).  Wotring testified, "(t)his was a very big remerchandising compared to, I guess, the normal remerchandising." (Id. at 10).

5.    Gorman had been instructed to hire 100 new employees "in about a month" in the Spring of 2005.  This process was ongoing on April 18, 2005. (Pl. Mem., Ex. 11, ¶¶ 5-6).

6.    Anderson left Lowe's No. 385 on April 18, 2005 and never returned.

**K.    Illness - April 2005 Continued**

1.    Anderson returned to his doctor the next day, April 19, 2005.  He reported that he "had contemplated suicide [on April 18, 2005] as a result of perceived discrimination and retaliation during employment with Lowes." (Pl. Mem., Ex. 1, pp. 1-2).

2.    Anderson's physician consulted with his "treating therapist," and he was referred to Mark Sloan ("Sloan"), Ph.D. for treatment.

3.    Sloan saw Anderson on April 21, 2005, "for depression with suicidal ideations, confusion, and some somatic problems, including diverticulitis." (Pl. Mem., Ex. 24, pp. 12-14).[12]

4.    Sloan returned to his physician on April 25, 2005, complaining of shortness of breath, chest pains, and insomnia. (Pl. Mem., Ex. 1, p. 2).

---

[12]Sloan treated Anderson through November 8, 2005 (Id. at p. 10).

**L.     Leave Requests**

1.     On the April 19, 2005 visit, Anderson's doctor completed a Lowe's form indicating that Anderson had a "serious health condition" that would incapacitate him for "Four Or More" consecutive calendar days during which Anderson would not be "able to perform work of any kind." (Pl. Dep., Ex. 13).

2.     On that same day, April 19, 2005, Anderson presented Lowe's with the above  form and a Lowe's "Employee Request for Leave" for medical leave from April 19 through May 16, 2005.  The request was approved by Wotring also on April 19, 2005. (Pl. Dep., Ex. 15).

3.     Anderson returned to his physician on May 9, 2005.  The doctor completed another form indicating that Anderson would be unable to work for an additional period of time. (Pl. Dep., Ex. 11).

4.     On May 9, 2005, Anderson presented Lowe's with a second request "to extend leave through 6/27/05."  It was approved by Wotring that same day. (Pl. Dep., Ex. 12).

5.     Anderson returned to his doctor on August 4, 2005 and obtained a statement that he would be out of work indefinitely.  (Pl. Dep., Ex. 14).  Apparently a request for leave was granted.  Anderson's "Lowe's Job Summary" shows that he was on FMLA leave from April 20 through October 21, 2005. (Def. Mem., Ex. Z).

**M.     HRM at No. 385**

1.     Gorman and Thompson remained at No. 385 after April 18, 2005.

13

2.      It is unclear who bore the title of HRM while Anderson was on leave.

3.      The record shows that Thompson became a salaried HR employee at No. 385 on June 4, 2005. (Pl. Mem., Ex. 8, pp. 000043-000046).

4.      Lowe's posted the HRM position at No. 385 on July 15, 2005. (Def. Mem., Ex. CC).

5.      Thompson became an HRM on March 11, 2006 at Store No. 2356. (Pl. Mem., Ex. 8, pp. 000044 - 000045).

6.      According to Wotring, Thompson "took on the role of acting H.R. Manager while we were waiting for Laurence to come back." (Pl. Mem., Ex. 12, p. 46).

**N.      Resignation**

1.      On October 18, 2005, Anderson prepared a letter of resignation addressed to Wotring and caused it to be delivered. (Pl. Dep., Ex. 1).

2.      Lowe's records show that the resignation was effective on October 22, 2005. (Def. Mem., Ex. Z).

<u>**Discussion**</u>

A.      Disparate Treatment

Anderson alleges that he was involuntarily transferred from No. 499 to No. 385 because of his race.  In a disparate treatment case, such as this, Anderson must prove that "but for" his race, he would not have been subjected to an adverse employment action.  <u>Holmes v. Bevilacqua</u>, 794 F.2d 142 (4th Cir. 1986).  He can prove Lowe's motive to discriminate in one of two ways.  First, Anderson "may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue.  In the alternative, a plaintiff may resort

14

to the judicially created scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936 (4th Cir. 1992).

      1.     Direct Evidence

      Direct evidence is evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor...." <u>Cline v. Roadway Express, Inc</u>., 689 F.2d 481, 485 (4th Cir. 1982) (citing <u>Spagnuolo v. Whirlpool Corp</u>., 641 F.2d 1109, 1113 (4th Cir.), *cert. denied*, 454 U.S. 860 (1981)).  In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  <u>Fuller v. Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds,* <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003) (evidentiary standard for mixed motive analysis).  Anderson has produced no direct evidence to satisfy this standard.

      2.     Prima Facie Case

      In order to establish a prima facie case of reverse discrimination, Anderson must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action he was performing up to Lowe's expectations; and (4) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  <u>Carter v. Ball</u>, 33 F.3d 450, 458 (4th Cir. 1994).

      The parties, citing <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 607 (4th Cir. 1999), state the fourth element of the prima facie case as "other similarly situated employees who are not members of the protected class did not suffer the same adverse action." (Def. Mem., p. 11; Pl. Mem.,

pp. 25-26). However, the arguments of the parties do not address the fourth element as stated, but generally address whether Williamson and Barton were treated more favorably than Anderson. The evidence needed to prevail on the fourth prong may vary depending on the facts of the case. McDonnell Douglas, 411 U.S. at 802, n.13. In determining whether the evidence is sufficient, it is recognized that the purpose of the fourth element is to screen out those cases where the facts give rise to an inference of non-discrimination. Miles v. Dell, Inc., 429 F.3d 480, 488, n.5 (4th Cir. 2005). The undersigned concludes that the fourth element from Carter v. Ball stated above more closely addresses the facts of this case as evidenced by the arguments of the parties.

       a.      Adverse Employment Action

Lowe's asserts that Anderson's transfer to No. 385 was a lateral move and, therefore, did not constitute an adverse employment action. In Webster v. Rumsfeld, 156 Fed. Appx. 571, 2005 WL 3229753, *7 (4th Cir. 2005), Judge Traxler summarized circuit precedent relating to when a transfer may be considered an adverse employment action:

> "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment. Conduct short of ultimate employment decisions can constitute adverse employment action."[James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375-76 (4th Cir. 2004)]. "A tangible employment action constitutes a [significant] change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indust., Inc. v. Ellerth, 524 U.S. 742 (1998).[ ]
>
> Thus, a reassignment can "form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). However, a mere change in an employee's job assignment, even if "less appealing to the employee, ...does not constitute adverse employment action." Booz-Allen, 368 F.3d at 376. "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse

employment action even if the new job does cause some modest stress not present in the old position." Id.

It is undisputed that after the transfer, Anderson retained the same duties evidenced by the job description for the HRM position. (Def. Mem., Ex. W) However, he argues that, because of the "mass hiring" which was in progress at No. 385 at the time of the transfer, his workload would have been significantly increased, and he would be required to work longer hours. Anderson also argues that he would have suffered a loss in compensation due to decreased bonuses.

(1)     Responsibilities

An adverse employment action can be found "in a lateral transfer even where the transfer did not result in a reduction of pay or benefits." Collins v. Illinois, 830 F.2d 692, 702 (7th Cir. 1987). In Anderson v. Denmark Technical College, 479 F. Supp. 2d 551, 557-78 (D.S.C. 2007), the court found that a transfer from one location to another with no decrease in pay constituted an adverse employment action because plaintiff's responsibilities were significantly reduced. In that situation, the transfer was essentially a demotion. The opposite is true here. Anderson's responsibilities were no different, and the level of his responsibilities were unchanged. The fact that Anderson would be required to work different or more hours and to process a larger number of new hires did not change his responsibilities.

The HRM job description (Def. Mem., Ex. W) shows that there are no set hours for the position. The "Work Schedule" "(r)equires morning, afternoon and evening availability any day of the week." HRMs are "(g)enerally scheduled for 48 hours [per week]; more hours may be required based on the needs of the store." In sum, Anderson was simply faced with doing more of the same work. The undersigned concludes that Anderson's responsibilities remained unchanged, and he has not established that the transfer amounted to an adverse employment action on this basis.

17

(2)     Compensation

Anderson alleges that his transfer to No. 385 would have caused him to receive decreased compensation for fiscal year 2005.[13]  Lowe's argues since Anderson's potential for a bonus remained the same at both stores, he cannot prove an adverse employment action.

Anderson was eligible for three different types of bonuses.  Two of the bonuses were available to all store employees and the third (and most significant) was available to management employees.

The "Customer Focused" bonus and "Inventory Shrinkage Incentive Program" are available to all employees of each store.  The Customer Focused bonus relies on "mystery shoppers" who go into stores and rate the store based on customer service.  If a store received a sufficient "Gallup score," for customer service, all employees would receive a monetary bonus. (Def. Mem., Ex. 4). The Inventory Shrinkage Incentive Program provides bonuses to encourage employees to minimize "shrink," i.e., loss of inventory due to breakage, theft, etc.  The undersigned concludes that Anderson's prediction of a loss of these two bonuses is speculative.  Anderson points to no evidence to support his argument with respect to the two bonuses.  Indeed, the record shows that neither No. 499 nor 385 received these bonuses in 2005. (Pl. Mem., Ex. 14).

The bonus available to management employees, generally referred to as the "NBT,"[14] is based on the store's profitability.  It is a function of meeting annual sales and profitability goals projected by corporate headquarters. (Def. Mem., Ex. P and Pl. Mem., Ex. 7, p. 63).  A manager can receive a maximum bonus of 60% of his base pay under this plan.

---

[13]Lowe's fiscal year begins the first Saturday in February of each year.

[14]"NBT" refers to "net profit before taxes."

18

In Holland v. Washington Homes, Inc., 487 F.3d 208 (4th Cir. 2007) cert. denied, ___ U.S. ___, 128 S.Ct. 955 (2008), plaintiff, a real estate salesman whose compensation was based in part on commission, alleged that he was transferred from one subdivision to another because of his race. He asserted that the reassignment was an adverse employment action because his opportunities to earn commissions were less in the new subdivision. The district court disagreed and granted summary judgment. In affirming, the Fourth Circuit explained:

> Holland claims that selling homes in Hamlin Park would have been more difficult because the area was blighted, and thus, presumably, his compensation would have decreased. Beyond Holland's bald assertion, however, he has put forth no evidence demonstrating that his compensation would have been adversely affected by the reassignment. He did not identify where the neighborhood is located, the type of home being sold, the crime rate, or information about the home values in the surrounding area. In short, he has provided no evidence to support his assertion that he would have been adversely affected by the move. [S]peculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute [because] we are left to guesswork and conjecture as to what [Holland's] prospects would have been.

Holland v. Washington Homes, Inc., 487 F.3d at 219 (internal quotation marks and citation omitted).

The undersigned concludes that Anderson has presented sufficient evidence, in the light most favorable to him, to establish that his reassignment to No. 385 was an adverse employment action because his NBT bonus would have been less at No. 385 than it would be if he had been allowed to remain at No. 499. Anderson and Gorman testified that in April of 2005, they were aware that the bonus potential at No. 385 was limited. (Pl. Mem., Ex. 3, p. 89; Ex. 11, ¶¶ 8-9). Their prediction was based primarily on the massive, nine-month remerchandising which would last through the remainder of the fiscal year. Anderson raised this issue with Epps at their meeting on April 1. Although Lowe's management witnesses uniformly testified that in April one could not predict the profitability of a store because it was too early in the fiscal year, the undersigned concludes that

there is a reasonable inference that the construction and remerchandising would have a negative

impact on a store's profitability and reduce or eliminate the NBT bonus

The reasonableness of the inference gains support from the record. Mason, Store Manager

at No. 499, testified that his bonus for 2005 was less than 2004. He explained for 2005:

> (S)ales weren't there all year long and then the remerchandising had a
> negative effect on the profit side. A lot of that was budgeted in. But then
> because of a lack of sales during the entire year, we just didn't make it up
> after remerchandising was over.

(Pl. Mem., Ex. 2, p. 22). No. 499 was the store Anderson left and had a three-month merchandising

compared to the nine month remerchandising at No. 385.

Wotring, Store Manager at No. 385, testified that his store did not meet its sales and

profitability numbers for 2005 with "the construction and remerchandising...the primary cause." He

explained, "I think...with the having the parking lot roped off and in the process of moving items

from one location to another, that it may have frustrated some of the customers." (Pl. Mem., Ex. 12,

pp. 28-29).

King, the Regional Manager over both stores, testified about the remerchandising at No. 385:

> Q.     How does that affect your sales when that's going on?
> A.     It can, in fact, impact your sales.
> Q.     And did it, in fact, impact store 385's sales during remerchandising?
> A.     I'm sure it did.
> Q.     And did store 385 meet its sales numbers for fiscal year 2005?
> A.     I don't believe it did.

(Pl. Mem., Ex. 7, pp. 64-105). In fact, the record shows that the NBT bonus for Store No. 385 was

lower than the NBT bonus for Store No. 499 for 2005. (Def. Mem., Ex. R).

      b.     Inference of Discrimination

         As noted above, the fourth element of the prima facie case can be satisfied

if Anderson shows that his transfer occurred under circumstances which give rise to an inference

of discrimination. Such an inference would be clear where a plaintiff and his comparators worked at the same location and plaintiff, to his detriment, was the only one transferred. Such is not the case here. Anderson and his comparators, Williamson and Barton, were all transferred. Anderson argues that Williamson and Barton "did not suffer the same adverse action." (Pl. Mem., p. 27). The undersigned disagrees because all three employees were treated equally in that they were all transferred from one store to another, in the same position, with the same responsibilities.

Anderson stretches his argument to include the indirect consequences of the transfers. In this regard, Anderson argues that of the three, he "was the only one to suffer a detriment." (Id.). He offers three arguments, two of which have little import.

Anderson asserts that Barton and Williamson received benefits from their transfers which he did not receive. Barton's transfer resulted in her being moved to a store closer to her residence. Anderson's transfer had a negligible effect on his travel distance.[15] The fact that Barton received an indirect benefit by being moved closer to her home is not a circumstance that gives rise to an inference of discrimination. It would be very improbable that three employees could be transferred with all being moved closer to their residences.

Likewise, Anderson argues that Williamson received a benefit from her move because she had experienced difficulties with the store manager at No. 1064 and would receive a "clean slate" by moving to No. 499. The fact that Williamson had issues at No. 1064 is not in dispute. In Crews' memorandum to Fuller giving an HR analysis fo the proposed moves, he notes the low Gallup scores at No. 1064 and the "ineffective partnership of the HRM and the SM." One of the positive reasons for the move was to give Williamson "a clean slate." (Pl. Mem., Ex. 10). The problem with this

---

[15]Epps was concerned about this issue. In his email to Fuller and Crews of March 31, 2005, he stated that he took "into account where each HR Manager lives to ensure there is no hardship involved in the move." (Pl. Mem., Ex. 10).

argument is that Anderson did not have a slate that needed to be cleaned.  Crews recognized Anderson as "an HR professional." (Id.).  This indirect benefit to Williamson is not a circumstance that gives rise to an inference of discrimination.

Last, Anderson argues that Barton and Williamson were treated more favorably because he got a smaller raise ("performance increase") because he "only received a 3.5% increase for performance in the 30 days before the transfer while Barton got a raise in excess of 10% and Williamson got a 6% 'performance increase.'" (Pl. Mem., p. 29).  The initial problem with Anderson's argument is that there is no evidence that the raises were based on transfers.

The record shows that Lowe's considers raises for its employees in March of each year. Anderson, Barton, and Williamson each received a performance increase on March 12, 2005. Lowe's records show the effect of this raise:

| Name | Salary | % Increase | New Salary |
|------|--------|-----------|------------|
| Anderson | $48,692.80 | 3.460 | $50,377.60 |
| Barton | $35,006.40 | 1.750 | $35,619.01 |
| Williamson | $35,880.00 | 6.029 | $38,043.20 |

(Def. Mem., Ex. Z).

April 9, 2005 was the date that all three transfers became official.  These records show that on that date, Barton received a second performance increase of 9.969% raising her salary to $39,170.84. Neither Anderson nor Williamson received a raise on April 9.

With respect to the March raises, Anderson received a higher percentage raise than Barton but a lower percentage raise than Williamson. Crews testified that Anderson's potential raise was restricted by "corporate directive" because he was "already at the max of the [salary] range" for HRMs (Def. Mem., Ex. AA, p. 156).  The testimony of Epps is consistent with that of Crews.  When

asked if an employee could obtain a raise when he was at the maximum pay rate for the position, Epps stated:

> (N)o, you would not get an increase. The company position that we have is...whatever the max is, that is the maximum amount that we're willing to pay for that job position. Once you reach the max...that's the maximum offered for that job position. To increase your pay, you'd have to get another position.

(Def. Mem., Ex. F, p. 33). This testimony is supported by Anderson's relatively long tenure. He had become an HRM when the position was created. (Id.). Anderson's actual salary was substantially higher than that of Barton and Williamson both before and after the March performance increases. Anderson has offered no evidence that he was not at the maximum salary for the HRM position.

Anderson further argues that the substantial raise Barton received in April of 2005 is a circumstance giving rise to an inference of discrimination because Lowe's records show that it was entered as a "performance increase" (Def. Mem., Ex. Z) instead of a different category. (Pl. Mem., p. 28). The undersigned disagrees.

The only evidence in the record concerning Barton's April raise is that she received the increase because she moved from a low volume store (Newberry) to a store with a higher volume of sales (No. 1064). According to Crews, "district managers and store managers have complete authority to give whatever raises they deem necessary, as long as it's within the guidelines." (Pl. Mem., Ex. 23, p. 50). He further explained that in 2005, Lowe's stores were categorized by sales volume into low, average, high, and very high markets. (Id. at 17). Crews believed that Newberry (No. 2520) was a low market and Garner's Ferry (No. 1064) was an average market. (Id.) He also testified that if a person were moved from a lower market to a higher market, the adjustment would be made at that time. (Id. at 16). The records show that Barton received this increase on the

23

effective date of her transfer. (Def. Mem., Ex. Z).  The deposition testimony of Epps (Def. Mem., Ex. F, pp. 31-33), Fuller (Def. Mem., Ex. G, p. 10), and King (Def. Mem., Ex. H, p. 35) support the conclusion that Barton's April raise was market based.  On the other hand, Anderson and Williamson both moved from an average market store to another average market store (Def. Mem., Ex. 23, p. 17) and did not receive an increase upon their transfers. (Def. Mem., Ex. Z).

The undersigned concludes that Anderson's transfer did not occur under circumstances that give rise to an inference of discrimination.  In any event, as discussed below, Lowe's has proffered a legitimate, non-discriminatory reason for Anderson's transfer which he has not shown to be a pretext for discrimination.

      B.     Retaliation

      To establish a prima facie case of retaliation, it must be demonstrated that:

      (1)     the employee engaged in protected activity;

      (2)     the employer took some adverse employment action against the employee; and

      (3)     a causal connection existed between the protected activity and the adverse action.

See Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d at 460.

The undersigned concludes that Anderson has established a prima facie case of retaliation. Lowe's concedes that Anderson engaged in protected activity when he filed and prosecuted Anderson I.  The above finding that Anderson's transfer from No. 499 to No. 385 constituted an adverse employment action necessarily means that Anderson has established the second element of the retaliation framework under the lessened standard set forth in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

Lowe's argues that Anderson cannot establish causation because the transfer in April 2005 did not occur in close proximity to the dates on which he filed his EEOC charge in Anderson I (September 9, 2003) and his complaint in Anderson I (June 2, 2004).  The undersigned rejects Lowe's restrictive reading of Title VII's retaliation provision.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), provides that it shall be an unlawful employment practice for an employer to discriminate against an employee because the employee has opposed a Title VII unlawful employment practice, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.  The "(a)ctivities under the participation clause are essential to the machinery set up by Title VII." Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 259, n. 4 (4th Cir. 1998).  Based on the broad statutory language ("participated in any manner") the participation clause is broadly construed.  Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999).  Thus, the undersigned concludes that Anderson's participation in Anderson I is not limited to the filing of his charge with the EEOC and his complaint in this court.  He continued participation in Anderson I until the case was resolved.

This Court ruled on Lowe's motion for summary judgment in Anderson I on March 30, 2006, and the case was settled thereafter.  The record in this case shows that the depositions of the Lowe's employees in Anderson I, including Crews and Fuller, occurred on January 19 and 20, 2005 (See Pl. Mem., Ex. 16, 19 and 20; Def. Mem., Ex. C).  There is also an indication that Epps became involved in Anderson I in the response to Crews' testimony concerning the Ida Hutto incident.  Anderson contends that on the day of Crews' deposition, Epps was called in to discuss the issue with Crews and Lowe's counsel.  See Pl. Mem., Ex. 3, p. 148-50 and Ex. 2, pp. 49-50.  Further, it is apparent that all Lowe's management employees were well aware of Anderson I.  After Epps

notified Anderson of the transfer on April 1, 2005, he emailed his supervisor, King, and informed him of the decision.  On April 2, 2005, King emailed Epps and stated "(i)n the future I would like to know PRIOR to moves being made and announced especially when they involve people who are in litigation." (Emphasis in original).  Crews responded on April 3, 2005 that because "these moves...were all laterals...we are totally clean." (Pl. Mem., Ex. 10).  Last, counsel for Anderson branded the transfer as retaliatory as early as April 11, 2005 and asked that it be rescinded. (Pl. Mem., Ex. 5).

The parties were engaged in hard fought litigation before and after Anderson's transfer.  His continuing participation in Anderson I must be considered in finding that he has established the required causal connection for the purpose of summary judgment.

      C.      Pretext

Due to the difficulty in proving discrimination in employment, the courts have devised a three-step process to allow a plaintiff to prove his case by indirect means.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must establish a prima facie case of discrimination or retaliation.  The framework for establishing a prima facie case varies depending on the specific claim and the factual scenario developed.  If the plaintiff establishes the prima facie case, the burden at the second step shifts to the employer "to articulate a legitimate, nondiscriminatory [or nonretaliatory] reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).  The employer's burden at step two is one of production, not persuasion.  Holland v. Washington Homes, Inc., 487 F.3d at 214.  The burden returns to the plaintiff at step three to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Hill at 285.  Specifically, the plaintiff must "prove by a preponderance of the evidence that the

'legitimate reasons offered by the [employer] were not the true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  At the third step, the burden to demonstrate pretext has "merged with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  Plaintiff can meet this burden by showing that the proffered reason is not factually accurate or by the otherwise showing that it "is unworthy of credence."  Id.  Plaintiff can prove that the employer's articulated reason lacks credibility by showing that the employer has offered multiple or inconsistent justifications for its actions.  EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001).

The discussions above on disparate treatment and retaliation address step one of this three-step process. The undersigned has concluded that Anderson has failed to establish a prima facie case of racial discrimination and that he has proven a prima facie case of retaliation.  The transfer is the employment action complained of with respect to both claims.  Lowe's has articulated a legitimate, nondiscriminatory, and nonretaliatory reason for Anderson's transfer meeting its stage two burden. For the reasons discussed below, the undersigned concludes that even if Anderson could establish a prima facie case of racial discrimination he has not shown that the reason proffered by Lowe's is pretextual.  The same analysis applies equally to Anderson's claim of retaliation.

Under Lowe's management scheme, the HRMs are under the supervision of the AHRM (in this case Fuller) who in turn is under the Regional Human Resource's Director (i.e., Crews) for human resource purposes.  However, the HRMs are also subordinate to the Store Manager who in turn answers to the District Manager.

In February of 2005, Epps became manager of the district which includes the Lowe's stores relevant to this action. (Def. Mem., Ex. F, p. 4).  He became aware of Gorman's eminent retirement

later that month. (Id., p. 54). Epps' analysis of the stores in his district showed a glaring weakness–No. 1064, where Williamson was the HRM.  No. 1064 "just had a really bad inventory and bad Gallup score."  Id. at p. 55.  He felt a need to make a change at No. 1064, and he thought that moving Barton there would help improve morale. Id.  According to Epps, Gorman's retirement and the problems at No. 1064  were the "triggering factors" which resulted in the plan to transfer the HRMs including Anderson discussed above. (Id. at pp. 54-55).

It is undisputed that Epps had the authority to execute the moves even over objection from Fuller and Crews.  He gave Fuller and Crews the opportunity to comment before the moves were announced and did not notify King until after the effected HRMs were informed of the transfers. (Pl. Mem., Ex. 10).  Anderson argues that Fuller and Crews were behind his transfer, but there is no credible evidence to support such an inference.  Epps' email to Fuller and Crews states in part:

> We have an HR Manager retiring on 4/18/05, Paul at 385.  Since that position will come open, I want to take that opportunity to relocate some of our HR Managers to better utilize the strengths and development opportunities of both the HR Managers themselves and the stores.  After taking into account where each HR Manager lives to ensure there is no hardship involved in the move, recent Gallup scores, and HR audits performed last year, I came up with these proposed moves-
>
> 1.    Transfer Gina Barton from 2520 to 1064.
> 2.    Transfer Audrey from 1064 to 499.
> 3.    Transfer Laurence Anderson from 499 to 385.
> 4.    Heidi, who is the HRM-in-training, would move to 2520 to replace Gina.

Fuller and Crews not only concurred in the moves from the HR perspective, but thought the transfers would improve each store.  Crews drafted an analysis of the transfers and sent it to Fuller on April 3, 2005.  It stated:

> **Triggering Event: Imminent retirement of Paul at 385**.  Paul has been among the weakest HRM[s] in the District, if not the region, since his promotion 2 years ago.  As a result, this high volume store has not had an effective HR presence since

28

Region 16 was formed.  Heidi, an HRM-In-Training has been working out of this store to assist Paul.

1.    Moving Laurence (WM) to 499-385:
   a.    Allows Richard to place his strongest HRM in what is probably his most broken store from an HR perspective.
   b.    Places Laurence in a store of comparable volume.
   c.    Gets Laurence out of a store where he has been the HR presence for over 7-8 years.
   d.    Places Laurence in a store with a SM that is new in that store and a future player with the company.  This now completes that SM's management team and gives the SM an opportunity to turn the HR concerns over to an HR professional.  Ron deserves it.
   e.    385 is much closer to Laurence's residence.  Laurence has everything to gain and nothing to lose.  Having said this, he will probably push back versus seeing this as a demonstration of Richard's confidence in him to fix 385.
   f.    Great Move!

2.    Moving Audrey (BF) from 1064 to 499:

   a.    1064 has been in the bottom 10% of Gallup for 2 years running.  Richard has to address this issue.  The effective partnership of the HRM and the SM contributes greatly to this issue.
   b.    Allows Audrey a clean slate.  She has worked for a SM who has not held her accountable for performing up to the level where she is capable.  Craig will hold her to a higher standard and hopefully bring out her full potential. S[sic]
   c.    499 is much closer to her home.
   d.    There may be a little push back but only because she has thing her own way at 1064.  This will take her out of her comfort zone.  She'll have to go back to work now.  There is NO REASON for her not to succeed.  She is stepping into one of the most well maintained HR offices in the company. To me, this move is the key to everything Richard is doing.
   e.    Another Great move!

3.    Moving Gina (AI female) from 2550 to 1064:

   a.    Creates an instant fix to the Gallup issue at 1064.  Gina's engaging, compassionate management style will be a total contrast to Audrey's closed, introverted style.

b.      She will put pressure on the SM to "do the right thing." A-lines from this store should cease to exist with Gina there.

c.      1064 is much closer to Gina's house.

4.      Moving Heidi (WF) from 385 to 2550:

a.      Heidi has been training at 385 since she was promoted. She is ready to "run" her own ship. What better place for her to continue to learn her trade tha[n] at a small, low volume store, especially following a HRM like Gina who set an HR friendly tone there already. Heidi simply has to maintain it and concentrate on building a relationship with the SM.

(Id.)

Thus, Lowe's articulated nondiscriminatory, nonretaliatory reason for transferring Anderson from No. 499 to No. 385 is that it was part of an HRM reorganization designed to strengthen the HR process and overall business of each of the four stores. The reorganization was triggered by Gorman's upcoming retirement and was based on Epps' assessment of the needs of each store and the strengths and weaknesses of the HRMs involved. It should be recognized that Epps, Fuller, and Crews considered Anderson to be the best HRM of those affected and that his talents could be utilized to get No. 385 back on track following Gorman's retirement.

Anderson does not directly attack Lowe's proffered reason. Instead, he argues that "(t)he lies and dissembling demonstrated by Defendant's own documents render Defendant's stated reasons regarding the moves unworth [sic] of credence, which gives rise to an inference of discrimination and pretext." (Def. Mem., p. 30).

Anderson principally argues that Epps lied to his supervisor, King, in his email of April 1, 2005. In that email, Epps stated that "(n)one of the moves were demotions or promotions, just lateral moves to different stores." (Pl. Mem., Ex. 10). Anderson argues that this statement is untrue because White was promoted to HRM-in-training to HRM. Anderson's argument is factually correct, but of little relevance with respect to Anderson's move. In any event, Epps in emailing

King, attached his emails with Fuller and Crews concerning the transfers which clearly show that White was receiving a promotion.

Anderson also argues that "King was left to believe that no one got increases to move, yet Barton got a 10% performance increase and Williamson got double the 'performance increase' than that received by Plaintiff." (Id.). The email to King does not discuss the effect of Lowe's policies on the raises which might accompany the transfers. The raises are discussed in detail above. Epps made no representation to King in this regard.

Last, Anderson argues that Epps' statement to King that Anderson was unhappy "with the move, but could not give me any valid reason why he could not go." (Id.). Anderson contends that this statement is false because he told Epps on April 1, 2005, that he did not want to go to No. 385 because of his health problems as evidenced by Epps' contemporaneous memorandum of the meeting. (Pl. Mem., Ex. 4). Epps explained that he was unaware of any specific health problem of Anderson on April 1 and that he felt that if Anderson could perform his duties at No. 499 he could perform the same duties at No. 385. In other words, Epps did not consider this reason to be valid.

Anderson has not shown that the reasons for the transfers proffered by Lowe's through Epps were false or unworthy of credence. He has failed to show pretext.[16]

D.    Section 1981

Anderson argues one claim under only § 1981 because he was unaware of the claim at the time he filed his EEOC charge preceding the present action. Anderson served as Lowe's HR

---

[16]Anderson cites several factors, including the threatened reprimands relating to the incidents involving Ida Hutto, Joyce Goodwin, and his father, as evidence of Lowe's retaliatory intent, presumably of such strength to support his retaliation claim or to show pretext. The undersigned rejects this argument. First, Anderson does not dispute that these incidents did not occur, but only that he did not deserve to be reprimanded. Second, he was not reprimanded.

District Network Trainer until July of 2004.  He received additional bi-weekly pay of $40 for this position.  He was told that the position was eliminated and his extra pay ceased.

Blondene Robinson ("Robinson"), an African-American, transferred to Anderson's old store, No. 499, in January of 2006 to replace Williamson.  During her deposition, Robinson testified that when she became HRM at No. 499 she also became an "HR training manager" and thereby received an 8% increase in salary.  She also testified that she had not reviewed her personnel records prior to her testimony. (Pl. Mem., Ex. 27, pp. 8-14).

Based on Robinson's testimony, Anderson argued, apparently for the first time, in his opposition memorandum that his removal from the position of HR District Network Trainer was based on his race.  Lowe's addressed this claim in its reply memorandum and supported its arguments with Robinson's affidavit. (Def. Mem., Ex. BB).  Robinson avers that she reviewed her deposition testimony and her personnel records (Def. Mem., Ex. CC) and realized that she never received any designation as a training manager and that she received the increase in her salary because she was transferred from a lower volume store to a higher volume store.  Robinson's records do not contradict her affidavit, and Anderson has offered nothing further.  Based on this record, Lowe's is entitled to summary judgment on this claim.

E.    FMLA

"Qualifying employees are guaranteed 12 weeks of unpaid leave each year by the Family and Medical Leave Act of 1993."  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 84 (2002).  "Congress enacted the FMLA in response to growing concerns about 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'"  Babcock v. Bellsouth Advertising and Publishing Corp., 348 F.3d 73, 76 (4th Cir. 2003), quoting Miller v. AT&T, 250 F.3d 820, 833 (4th Cir. 2001).

Under the FMLA, eligible employees may take leave "for medical reasons, the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The FMLA provides that eligible employees are entitled to up to 12 weeks of unpaid leave during any twelve month period, which can be taken by working a reduced number of hours per day or per week. 29 U.S.C. § 2612(a)(1); 29 U.S.C. § 2611(9). Leave is permitted when an eligible employee has a "serious health condition" that makes the employee "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1). The Act prohibits employers from interfering with or denying an employee the rights granted by the FMLA and grants employees a private right of action against employers who violate the Act. 29 U.S.C. § 2615(a)(1); 29 U.S.C. § 2617(a). Employees who take leave pursuant to the FMLA are generally entitled to return to the same or equivalent position with the same benefits as they had prior to taking the leave. 29 U.S.C. § 2614(a)(1). A serious health condition is defined as involving either inpatient care in a medical care facility or continuing treatment by a health care provider. 29 U.S.C. § 2611(11).

The Fourth Circuit has explained that two types of employee rights are protected by the FMLA. The first is substantive or prescriptive rights protected under 29 U.S.C. § 2615(a)(1). Violation of these rights give rise to "interference" or "entitlement" claims. On the other hand, proscriptive rights arise under 29 U.S.C. § 2615(a)(2). Violations of these rights may result in "retaliation" or "discrimination claims" by the employee. Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 546 (4th Cir. 2006).

Anderson has clarified that he only alleges violations of his prescriptive rights under the FMLA. Specifically, Anderson asserts that Lowe's: (1) failed to provide him notice of his FMLA rights and (2) failed to reinstate him to the same or an equivalent position when he returned from FMLA leave. (Pl. Mem., pp. 16-25).

33

> To establish unlawful interference with an entitlement to FMLA benefits, an employee must prove that (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled.

Rodriguez v. Smithfield Packing Co., Inc., ___ F.Supp.2d ___, 2008 WL 1000471, *5 (D.Md. 2008), citing Edgar v. JAC Prods. Inc., 443 F.3d 501, 507 (6th Cir. 2006) and 29 U.S.C. § 2615(a)(1).

It is undisputed that Anderson was an eligible employee and that Lowe's was covered by the FMLA. Further, Anderson was, at some point, entitled to FMLA leave. The timing of his entitlement is intertwined with the notice issues raised by the pleadings.

### 1.     Notice - Adequacy and Timing

The Secretary has promulgated regulations implementing the FMLA pursuant to 29 U.S.C. § 2654. See 29 C.F.R. § 825.100, *et seq*. "Regulations promulgated pursuant to such an express delegation of authority 'are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" Miller v. AT&T Corp., 250 F.3d at 833, quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984).

The FMLA regulations create a reciprocal notice requirement between the employer and employee. The employer is required to conspicuously post an explanation of the FMLA in the place of business. 29 C.F.R. § 825.300(a). Further, if the employer provides employees with "written guidance," such as an employee handbook, FMLA information must be included. 29 C.F.R. § 301(a)(1).[17] Also, the employer must provide the employee with detailed information concerning the FMLA after being notified of the employee's need for FMLA leave. § 825.301.

---

[17]Anderson does not appear to argue that Lowe's did not properly post FMLA notice nor include it in a handbook.

Anderson asserts that Lowe's did not give him the detailed notice required by § 825.301(c). The regulation requires that "(t)he [§ 825.301(b)] notice shall be given within a reasonable time after notice for the need for leave is given by the employee–within one or two business days if feasible. If leave has already begun, the notice should be mailed to the employee's address of record." § 825.301(c). Thus, the "employee is mandated to provide notice to her employer when she requires FMLA leave." <u>Rhoads v. F.D.I.C.</u>, 257 F.3d 373, 382 (4th Cir. 2001).

The responsibilities of the employee to provide notice to the employer are contained in § 825.303 (when the need for FMLA leave is not foreseeable). The parties appear to agree that Anderson's need for FMLA was not foreseeable and that § 825.303 is applicable. That section states in part:

> (a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

> (b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

Additionally, the employer may require the employee to comply with its leave request policies (§ 825.302(d)) and to provide medical certifications to support FMLA leave requests (§ 825.305).

Exhibit 22 to Anderson's opposition memorandum is a copy of Lowe's Human Resources Management Guide pertaining to "Leave of Absence" including FMLA. The policy mentions an "Employee Request for Leave/FMLA rights form" and an "Employee and Family Medical Leave" form for physician certification.[18] It appears that the FMLA notice is on the reverse of Lowe's "Employee Request for Leave" forms. (Pl. Dep. 12 and 15). According to the policy, it is the responsibility of the store manager and/or the HRM[19] to provide these forms to the employee "(t)o meet FMLA requirements."

Anderson argues that he gave Lowe's adequate notice to trigger the reciprocal responsibility of Lowe's to give him notice of the rights and protections afforded to him as an employee under the FMLA.[20] The record supports Anderson's argument.

The employee is required to provide the employer with adequate and timely notice. In doing so, the employee must provide the employer of "(1) such facts as to make the employer aware that the employee needed leave due to a **serious health condition**; and (2) 'the anticipated timing and duration of the leave'" Rodriguez v. Smithfield Parking Co., Inc., at *5 citing 29 C.F.R.

---

[18]These forms are the ones eventually used by Anderson to request leave on April 19, 2005. See Pl. Dep., Ex. 13 and 15.

[19]The policy is dated June 15, 2002. It actually refers to a "TPC" instead of an HRM. The TPC position evolved into the HRM position after publication of the policy.

[20]It is clear that Lowe's delegated to HRMs the responsibility to insure that it complied with the FMLA. Therefore, it cannot be suggested that Anderson was not fully aware of the rights and protections under the FMLA that are contained in the notice he did not receive.

§ 825.302(c).[21]  The timing of the notice required of the employee is provided in § 825.303(a).

"Where the need for leave was not foreseeable, this notice should be given 'as soon as practical

under the facts and circumstances of the particular case,' with an expectation that the notice will

occur 'within no more than one or two working days of the learning of the need for leave, except

in extraordinary circumstances where the notice is not feasible.'" Id. quoting 29 C.F.R. § 825.303(a).

The definition of "serious health condition" is provided in 29 C.F.R. § 825.114.  It states in

relevant part:

> For purposes of FMLA, "serious health condition" entitling an employee to FMLA
> leave means an illness, injury, impairment, or physical or mental condition that
> involves:
>
> > an illness, injury, impairment, or physical or mental condition that involves:
> >
> > > (1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or
> > > residential medical care facility, including any period of incapacity
> > > (for purposes of this section, defined to mean inability to work, attend
> > > school or perform other regular daily activities due to the serious
> > > health condition, treatment therefor, or recovery therefrom), or any
> > > subsequent treatment in connection with such inpatient care; or
> > >
> > > (2) Continuing treatment by a health care provider....

The regulation goes on to state that "continuing treatment by a health care provider" includes in

pertinent part:

> > (i) A period of incapacity (i.e., inability to work, attend school or perform
> > other regular daily activities due to the serious health condition, treatment
> > therefor, or recovery therefrom) of more than three consecutive calendar
> > days, and any subsequent treatment or period of incapacity relating to the
> > same condition, that also involves:
> >
> > > (A) Treatment two or more times by a health care provider, by a
> > > nurse or physician's assistant under direct supervision of a health care

---

[21]The court explained that even though this section specifically relates to foreseeable leave,
the substance of the section applies equally to unforeseeable leave under § 825.303 and only the
timing of the delivery of the notice is affected by § 825.303.  Id., n. 9.

> provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i) (emphasis in original).

The undersigned concludes that in the light most favorable to Anderson the "Verification of Medical Treatment" form from his physician (Pl. Dep., Ex. 6) is sufficient to trigger the notice provisions of the FMLA. The form states that Anderson was treated by a physician on March 25 and 28, 2005 "for a medical problem" and indicates that Anderson would be out of work from March 25 through 31, 2005 allowing him to return to work on April 1, 2005.[22] Although the exact nature of Anderson's "medical problem" is not described in the form, it does provide the facts that Anderson was undergoing "continuing treatment" because he had "a period of incapacity (i.e., inability to work...) of more than three consecutive calendar days...that also involved: (A) Treatment two or more times by a health care provider..." According to Anderson, he provided this verification form with the others to Mason (Def. Mem., Ex. B, p. 61). Mason testified:

> I don't particularly recall a specific doctors note. I know that any time someone's out for more than three consecutive days, they have to provide documentation. So I'm sure being a H.R. manager, Laurence would have complied with that and he probably showed something to me. (Pl. Mem., Ex. 2, p. 6).

Therefore, Lowe's was required to give Anderson notice of his FMLA rights upon receipt of the verification form pursuant to 28 C.F.R. § 825.301(b). Lowe's failure to do so constitutes a violation of the FMLA.[23]

---

[22]The form is undated but one would assume that Anderson was given the form by his doctor at the March 28, 2005 visit.

[23]In reaching this conclusion, the undersigned is aware that Anderson was more informed
(continued...)

Thus as of April 1, 2005, the day Anderson returned to work and Epps advised him he was being transferred from No. 499 to No. 385, Anderson was entitled to notice and Lowe's could have sought further medical verification of his illness. The same analysis applies to the "Verification of Medical Examination and Treatment" resulting from Anderson's return visit to his doctor on April 5, 2005 (Pl. Dep., Ex. 7). That verification stated that Anderson should be out of work for thirteen days, from April 5 through April 17 and returning to work on April 18, 2005.[24]

However, Anderson is only entitled to relief if he was prejudiced because Lowe's did not give him timely notice. The FMLA:

> provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

Ragsdale v. Wolverine World Wide, Inc., 535 U.S. at 89. See also, Reed v. Buckeye Fire Equip., 241 Fed. Appx. 917, 924, 2007 WL 2173636 (4th Cir. 2007) (unpublished).

Anderson cannot show prejudice. Even though Anderson never requested FMLA leave, Lowe's afforded him FMLA leave after April 19, 2005. As discussed below, Anderson was not entitled to reinstatement to his job at No. 499. It is undisputed that Anderson was eventually

---

[23](...continued)
of FMLA rights and procedures than Mason, Fuller, or Crews. Further, Anderson did not use Lowe's form to specifically ask for FMLA leave of which he was surely aware. Last, Anderson was the individual at No. 499 who routinely made sure that Lowe's complied with the FMLA. However, neither the FMLA nor Lowe's policy appear to contemplate the situation where an employee in Anderson's position might seek FMLA leave. The parties have provided no cases which contain an exception to the FMLA in such a circumstance.

[24]As discussed above, Anderson returned to work on April 18, 2005, left, and did not return. He used Lowe's "Employee Request for Leave" form (Pl. Dep., Ex. 15) and "Certification of Health Care Provider" (Pl. Dep., Ex. 13) for his continued leave. Anderson requested medical (i.e., paid) leave and not FMLA leave at that time. Lowe's records show that Anderson was on FMLA leave beginning April 20, 2005. (Def. Mem., Ex. Z).

terminated because he could not perform the functions of the HRM position after he exhausted his FMLA leave.

        2.     Reinstatement

      The second prescriptive FMLA right which Anderson alleges was violated by Lowe's is his right to have been restored to his position as HRM at No. 499. This right is set forth in 29 U.S.C. § 2614 and requires employers to restore an employee returning from FMLA leave either to the same position or "an equivalent position with employment benefits, pay, and other terms and conditions of employment."

Anderson argues that if Lowe's had properly given him FMLA notice and placed him on FMLA leave (even though he never requested it as discussed above), Lowe's would have been required to return him to his position at No. 499, because the same position at No. 385 was not an "equivalent position." The regulations, 29 C.F.R. § 825.215, extensively define the term. "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." (29 C.F.R. § 825.215(a)). However, "(t)he requirement that an employee be restored to...[an] equivalent job with equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis or intangible, unmeasurable aspects of the job." (29 C.F.R. § 825.215(f)).

After reviewing the regulations, the undersigned concludes that the HRM positions at No. 499 and No. 385 were equivalent positions for FMLA purposes. The position titles, pay, and responsibilities were all the same. Anderson was not required to commute further due to the reassignment. The fact that Anderson may have been required to work more hours or process more

paperwork amount to de minimis differences between the two positions.  <u>Akers v. Bowl America, Inc.</u>, 2001 WL 34760070, *3 (E.D.Va. 2001), *aff'd*, 93 Fed. Appx. 493 (4th Cir. 2004) (unpublished) (more physical labor and longer hours de minimis and do not affect the terms and conditions of employment).  <u>See</u> <u>also</u>, <u>Montgomery v. Maryland</u>, 266 F.3d 334, 341-42 (4th Cir. 2001), *vacated on other grounds by* <u>Montgomery v. Maryland</u>, 535 U.S. 1075 (2002) (changes in administrative duties de minimis); <u>Csicsmann v. Sallada</u>, 211 Fed. Appx. 163, 165 (4th Cir. 2006) (lessened prestige or visibility de minimis).

The only equivalency issue with respect to the transfer which merits further comment is Anderson's pay based on the potential for a smaller bonus at No. 385.  An employee returning from FMLA leave is entitled to a position with equivalent pay (29 C.F.R. § 825.215(c)).  The regulations recognize that "(m)any employers pay bonuses in different forms to employees for job related performance...." (29 C.F.R. § 825.215(c)(2)).  The regulations also recognize that some production bonuses are based on employee performance.  With respect to these types of bonuses, the regulations state, "(i)f the employee is on FMLA leave during any part of the period for which the bonus is computed, the employee is entitled to the same consideration for the bonus as other employees on paid or unpaid leave (as appropriate)."  <u>Id</u>.

Lowe's NBT bonus was an annual bonus based upon store performance which indirectly relates to the performance of management employees including the HRM.  If Anderson had been placed on FMLA leave in March of 2005 and returned to work at No. 385, he would still have been eligible for the NBT bonus.  See <u>Csicsmann v. Salada</u>, 2006 WL 3611729, *3 (summary judgment appropriate because plaintiff's "salary, title, **bonus eligibility**, health care and retirement benefits remained" unchanged in his new position) (emphasis added).  Anderson has not shown that he

would have not been given the same consideration for the NBT bonus as other employees who had

been on unpaid leave during the fiscal year.  (29 C.F.R. § 825.215(c)(2)).[25]

## Conclusion

Based on a review of the record, it is recommended that defendant's motion for summary

judgment be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

May 28, 2008
Columbia, South Carolina

---

[25]It seems somewhat inconsistent to find that Anderson's transfer was an adverse employment action for Title VII purposes based on the smaller bonus potential, but that the two positions are equivalent under the FMLA.  However, the FMLA regulations specifically address bonus eligibility, and the undersigned concludes that they require a different result.